BOWES, Judge.
This case comes to us on cross-appeals filed by plaintiff and defendant, after a judgment by the trial court awarding plaintiff the sum of $2,921.50, and dismissing defendant’s reconventional demand. We reverse in part, affirm in part and amend.
Kuswa filed suit originally against Thi-baut Construction Company for alleged damages in the form of lost profits, resulting from Thibaut’s termination of various construction contracts with Kuswa. Thi-baut reconvened to recover costs it claimed it incurred in repairing work purportedly done improperly by Kuswa. Additionally, Thibaut asserted a claim for damages in an amount equal to the “unnecessary” interest expenses which it supposedly incurred on its interim construction loans “as a result of Kuswa’s unreasonable delay in performance of the contracts.” The district court’s dismissal of the reconventional demand was made without comment. However, the trial judge did state in his reasons for judg *1340 ment that he found the contracts in question to have been made on a building-by-building basis, rather than “contingent” on plaintiffs performing the entire job. It is with this finding that we disagree.
On February 9, 1979, pursuant to a discussion with one Bill Christy (then supervisor of Thibaut Construction Company), Kuswa submitted a three-page “Proposal”, describing in detail the proposed work and the price — $2,850.00 per four-plex for painting and 14½ cents per square foot of sheet-rock.
At the top of the page in this particular document is this vital language on which this controversy hinges: “This bid is contingent on Kuswa & Associates, Inc., doing the same work on all four-plexes which are sixty-two (62) in number.”
This proposal, which states in the first sentence that it is a bid, was accepted by Thibaut, who, on March 28, 1979, entered into a “Sub-Contractor Base Agreement” with Kuswa, which agreement identifies this contract as one for painting and sheet-rock: “1) The work to be performed hereunder is generally described as Bid from Kuswa & Associates, Inc.”
Other than the standard form provisions, the only additional language refers to Price Lists, which state:
“See attachment schedule A
See attachment schedule B”
And, at the very top of the contract, above all other writing: ,
“See attachment I for the above (16) points.”
Attachment I, according to the trial testimony, evolved when Kuswa, uncomfortable about “vagueness” in some of the provisions (the “16 points”), elaborated on certain of them. For example, provision No. 12, formerly, provided:
12) From time to time under this agreement THIBAUT Construction Co., Inc. shall pay to Contractor upon completion and presentation of applicable Work Orders to the Superintendent in charge for his approval, sums in accordance with this agreement. Contractor expressly agrees in this context that he waives all rights to statutory or Constitutional liens on any job not fully performed by Contractor under this agreement.
Kuswa, in its attachment, added:
“12. Yes — with payment agreements made before building starts.”
Attachments A and B are merely payment schedules for painting and sheetrock —$200.00 to prime the exterior, $1,500 to complete the interior, etc. That base agreement, along with attachments I, A and B, were contended by Thibaut to constitute the entire initial contract, without reference to the February 9th proposal. Such, too, was the opinion of the trial judge. This contention is one which we find untenable.
This so-called initial agreement (dated March 28th) does not, in and of itself and including the attachments, sufficiently identify the work to be done. This “contract” makes no mention of the address of the property, and does not specify the quality of materials, detail of workmanship, etc.
Broadly considered, specifications of a contract can be or may be included within the body of the contract or agreement, or it may form the contents of a separate document properly identified with the contract itself. Generally, specifications have to do with spelling out in detail the quality, quantity, character or conditions under which the subject matter of the contract may be or shall be performed. Specifically, the specifications should be definite, certain, explicit and express, [emphasis supplied] Toye Bros. Yellow Cab Co. v. City of New Orleans, 264 So.2d 768 (La.App. 4th Cir.1972).
This court finds that the word “bid” referred to in the March 28th contract itself concerns the February 9, 1979 document, and thereby incorporates this document into the initial contract itself.
Contracts need not be imposed in a single instrument but may include documents by reference thereto. Calcon, Inc. v. Young Companies, Inc., 822 So.2d 883 (La.App. 1st Cir.1975). We find the wording of *1341 the phrase “Bid from Kuswa & Associates, Inc.” sufficiently clear to describe the proposal of February 9th. We further find that incorporation of this bid (February 9th) is a necessary action in order to give sense to the contract as the February 9th instrument details the preparation, painting, staining, sheetrock size, quality of texture, etc.
The pay schedules and enlargement on the base provisions (the attachments) do not provide such specifications. We find therefore that the trial court was in error when it concluded that the word “bid” referred solely to the attachments “A” and “B”.
We are of the opinion that “bid” referred to the proposal of Kuswa dated February 9th as it delineated the specifications for the entire contract initially contemplated by the parties for painting and sheetrocking. Ergo, the Sub Contractor Base Agreement of March 28th, with attachments I, A, and B, and the February 9th proposal, comprise the entire original contract between Kuswa and Thibaut. The contract considered without the February proposal is not of itself meaningful within the contemplation of Civil Code articles 1951 and 1955.[1]
But an agreement must be interpreted as a whole and, where possible, effect should be given to all clauses of an agreement; and a construction will be preferred which gives a reasonable meaning to each clause of an agreement, rather than one which leaves any clause useless or inexplicable. Articles 1951, 1955, LSA-Civil Code, and jurisprudence thereunder. [emphasis supplied]. Green v. Southern Furniture Co., 94 So.2d 508 (La.App. 1st Cir.1957)
It fellows, therefore, from the wording of the February 9th bid, that the contract was for 62 four-plexes, contemplated by Mr. Thibaut, as the number of buildings yet to be constructed at the time of the contract.
Defendant argues that had the proposal in question been intended to be part of the March 28th contract, it would have been so identified as another attachment. Considering the rather vague manner with which business dealings between the parties was handled, the court finds this argument somewhat specious.
Thibaut’s argument that it was not the owner of 62 lots in the subdivision, or did not have an agreement to purchase the lots, or that it did not have construction financing available, etc., and so could not have contemplated contracting for 62 buildings is equally unsound. The fact that Kuswa was given a list at the inception of the arrangement, of 62 addresses of the four-plexes, for billing purposes and, more importantly, the fact that as of the date of trial, almost all 62 buildings had been completed, defines with much certainty the intent of Thibaut to build 62 units.
Consequently, in accordance with Civil Code Article 1945(2)(3), we are bound to give legal effect to these contracts according to the true intent of the parties; and intent is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences. We conclude that, as shown above, to give credence to defendant’s version of the contract would, indeed, lead to absurd consequences.
Such interpretations as we have placed on the documents of February 9th and March 28th we find relevant to the sheetrock and painting contracts only. Subsequent to the March 28 contract, another document, also titled “Sub-Contractor Base Agreement” and dated April 30, 1979, delineated an apparent change in the pay schedule to be paid to Kuswa for sheetrock-ing. From the testimony of Robert Kuswa, it is evident that a change had taken place *1342 within Kuswa’s business to this extent; previously, at the inception of the contract in question, Kuswa had actually “subbed” the sheetrock work to one Dave Brown. When the April 30 contract was signed, Kuswa had decided to have its own workmen perform the sheetrock work, and actually did complete one house. We find, therefore, that the April 30 document was an amendment to the March contract, and, therefore, relates back to that agreement.
We do not believe, however, that there is sufficient evidence before us to permit this court to conclude that the frame and trim contracts were also intended to encompass all 62 four-plexes. The major basis for this reasoning is that none of those agreements or revisions, dated August 7, August 8, October 8, November 29, and November 30, make reference to the original contract at any point. The type work to be done was separate and distinct from the type of work originally specified, (as opposed to Duffy v. Lagasse, 65 So.2d 337 (Ct.App. Orleans 1953), upon which plaintiff relies.) Different equipment and materials were needed to complete the trim and frame, than to complete the paint and sheetrock. While it may very well be that Kuswa and Thibaut both intended plaintiff to trim and frame all of the remaining buildings, both the differing nature of the work to be performed, and the failure of the subsequent contracts to refer back to the original, persuade us to determine otherwise.
The initial contract itself requires a written termination as provided for in each of the Sub-Contractor Base Agreements, which were drawn by Thibaut:
“14) This Contract shall remain in full force and effect until termination in writing with any and all notices to be sent to the Contractor at the address shown above.”
The absolutely uncontroverted evidence at the trial showed that no written, nor even oral, notice of termination has ever been sent; indeed, Kuswa was simply given no further work to do on the project. Jim Owens, the project supervisor at the time Kuswa was “eased” out, testified that he was instructed to “phase out” the plaintiff. There is no question but that defendant breached the contract by failure to give written notice of termination, as plainly required.
In addition, this court is unconvinced that Kuswa performed work in an unwork-manlike manner so as to be in breach of the contract. Owens testified that the work done by Kuswa was satisfactory for the most part, and any mistakes or problems (classified as “punch list” work by the testimony) could have easily been corrected by Kuswa, itself, had it been requested or given a chance to do so by defendant. The majority of defendant’s exhibits showing failed initial inspections also show final approval, and final inspections as complete, all during the time that Kuswa was on the job sites or available to be there. The record does not support a conclusion that Kuswa did not complete the “punch” lists necessary for the sites in question, or would not have done so had they been given the opportunity. We note here that we disagree with the contentions of counsel for defendant that Owens was a “hostile” witness and that his testimony was impeached.
Plaintiff testified he was not given any such “punch lists” or an enumeration of things to be corrected near the end of his time at the site; and Owens testified that he was instructed to hire someone else to finish the buildings, and that Kuswa was not given the chance to correct any faults. It is therefore inequitable to characterize plaintiff’s product as “unworkmanlike” and a breach of the contract.
Because we find that the defendant breached the contract, it cannot recover for off-sets or costs of completing the work which would reduce plaintiff’s profits. Leto v. Cypress Builders, Inc., et al., 428 So.2d 819 (La.App. 4th Cir.1982), in which *1343 we concur. See also Guidry & Swayne v. Miller, 47 So.2d 721 (La.1950).
We are of the opinion that plaintiff is entitled to recovery of loss of profits under the total contract for the balance of the 62 buildings that he was not allowed to complete, for painting and sheetrocking, on the formula utilized in Guidry & Swayne v. Miller, supra, for fixed amount contracts:
[3] The correct way to ascertain the profit, if any, which plaintiff would have made had it been permitted to complete the work as contemplated by the contract and according to the plans and specifications is to ascertain with reasonable certainty just what amount it would have been necessary for the plaintiff to expend for labor and materials to complete the construction of the dwelling as contemplated by the contract and pursuant to the plans and specifications. To this amount, whatever it might be, should be added the total of the amount expended by plaintiff up to the time of the breach of the contract and the amount for which it is liable from the contract price of [sic] $9,497.00. The total of these two amounts, if less, should be deducted. By this method the plaintiff will be placed in as good a position as it would have been if it had been permitted to complete the contract.
More succintly, in White v. Rimmer and Garrett, Inc., 340 So.2d 283 (La.1976), the Supreme Court stated: “Lost profit is determined by deducting the cost of labor and materials from the total contract price.” (p. 286).
In the present case, we find that plaintiff Robert Kuswa’s testimony at the trial, based on his company’s records, was sufficiently reliable to meet the standards of “reasonable certainty” enunciated in Gui-dry. We base this finding on the trial transcript, itself, to wit:
At p. 14:
THE COURT:
YOU’RE OFFERING THE CHART ITSELF?
MR. LESTELLE:
YES SIR.
THE COURT:
IT’S NOT ADMISSIBLE, THE BEST EVIDENCE IS MR. KUSWA’S TESTIMONY WHICH IS IN THE RECORD.
(The chart referred to was a summary of buildings completed, computation of price, and number of buildings left to go).
At p. 15:
MS. CASTEIX:
BUT I THINK IT’S JUST A SUMMARY OF THE BUILDINGS COMPLETED, BUILDINGS LEFT TO GO, AND COMPUTATION OF PRICE, SO THAT FOR THE SAME REASONS I THINK THAT IT’S A SUMMARY OF TESTIMONY, AND FOR THAT REASON, NOT EVIDENCE.
THE COURT:
THE BEST EVIDENCE, ONCE AGAIN, IS MR. KUSWA’S TESTIMONY.
MR. LESTELLE:
WELL, AS LONG AS YOU’VE WRITTEN IT — WRITTEN DOWN THE FIGURES, YOUR HONOR, THAT’S FINE.
At cross-examination, on page 53:
Q. NOW, DO ANY PORTIONS OF THOSE — WELL HOW — HOW EXACTLY DO YOU DERIVE AT THOSE FIGURES? NOW, I KNOW YOU TOLD US ABOUT HOW MUCH IT COST YOU PER MAN AND HOW MANY HOURS, HOW MANY MEN, HOURLY RATE: IN REACHING THOSE, DID YOU GO BACK AND LOOK AT ANY CHECK STUBS OR ANYTHING THAT YOU ACTUALLY PAID?
A. I KNOW EXACTLY WHAT I PAY MY MEN EVERY WEEK. THE MEN GET PAID FOR WORK PRODUCED, *1344 NOT JUST BECAUSE IT’S FRIDAY, PAYDAY.
Q. SO YOU — THESE ESTIMATIONS OR THESE AVERAGES OF WORK, THAT’S BASED UPON YOUR REVIEWING YOUR RECORDS AND ACCURATELY DETERMINING THAT THAT WAS THE CASE AT TRIANON SQUARE?
A. ABSOLUTELY.
Mr. Kuswa reviewed his records, and, as defense counsel elicited, accurately determined the figures. Although admission of the chart in question was objected to, Kus-wa’s testimony was not — defense counsel herself cross-examined Mr. Kuswa in detail as to how his figures were computed and then, as particularized above, apparently came to the conclusion herself that Kuswa’s figures for lost profits were accurately based on previous records for the same or similar type construction.
While we feel that the records themselves may have been ultimately the best basis for an award of damages, and although we feel the profit figures as testified to by Mr. Kuswa are quite high, there is no showing in the record that the figures quoted by him were inaccurate, over-inflated, or otherwise incorrect. There was no contravening evidence or expert testimony presented by defendant. Kuswa’s figures stand unopposed and uncontradicted. We feel that the failure to object to Kuswa’s testimony supports the finding of the trial court that such was the best evidence available at trial.
Finally, defendant argues that since plaintiff was not a licensed contractor in the state of Louisiana at the time of the original contract, he is not entitled to damages, quoting United Stage Equipment v. Charles Carter & Co., 342 So.2d 1153 (La.App. 1st Cir.1977) and Louisiana Revised Statute 37:2151, United Stage and the cases under that statute.
The statute itself would seem to require Kuswa to obtain or hold a license, which it subsequently did (during the time Kuswa was still working at the Thibaut jobsite). R.S. 37:2160 makes it unlawful to engage in the business of contracting without a license. However, United Stage Equipment and the cases cited therein for support, evidently deal with out-of-state contractors who are unlicensed in Louisiana, yet are seeking recovery in Louisiana. For this reason alone, the cases are not persuasive. Further, plaintiff did have an occupational license with the Parish, which fact is conspicuously absent in United.
Finally, we find that defendant’s position in this regard would contravene public policy. To give effect to such interpretation would put many builders or owners in a position which would allow them to take undue advantage of unlicensed, yet capable, subcontractors, ignorant of the requirement, and could lead to a species of unjust enrichment. It is unknown and unascer-tainable from the record whether or not Thibaut knew about Kuswa’s licensing situation. Under the circumstances of this case, we believe it would be unjust, unfair and inequitable to adhere to such a stricture as defendant proposes and, therefore, reject that argument as inapplicable to the case at bar.
In taking this position, we do not mean to imply that we approve of contractors operating without a license or violating the law in any way. Indeed, quite the contrary is true. It is our opinion, however, that such violations should, instead, be punished by the criminal laws and such other sanctions as the legislature may specifically prescribe.
In accordance with Kuswa’s testimony at the trial, we find Kuswa and Associates, Inc., is entitled to recover for loss of profit as follows:
LOSS OF PROFITS OF PLAINTIFF FOR PAINTING & SHEETROCKING
1. Exterior Painting
Contract Price $ 1,136.25
Labor 120.00
Materials 160.00
Profit $ 856.25 per building
x 35 buildings remaining=
$29,968.75
*1345 2. Interior Painting
Contract Price $ 1,713.75
Labor 360.00
Materials 245.00
$ 1,108.75 per building
x 40 buildings =
$44,350.00
3. Sheetrock
Contract Price $ 3,340.00
Labor 1,200.00
Materials 800.00
$ 1,340.00 per building
x 40 buildings =
$53,600.00
TOTAL PROFIT LOSS - $127,918.75
We affirm that portion of the trial court’s judgment awarding plaintiff the sum of $2,921.50 on the unpaid invoice due and rejecting the reconventional demand of defendant. We reverse that portion of the judgment which rejected the other claims of plaintiff and accordingly, we amend the judgment of the trial court so as to grant judgment in favor of Kuswa and Associates, Inc. and against Thibaut Construction Company, Inc., in the sum of $130,840.25, with legal interest thereon from date of judicial demand until paid, each party to bear his own costs.
For the foregoing reasons, the judgment of the trial court is reversed in part, affirmed in part and amended.
REVERSED IN PART, AFFIRMED IN PART AND AMENDED.

. Art. 1951. When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nugatory.
Art. 1955. All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.